## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

JENNIFER DELAINE OWENS       CIV. ACTION NO. 3:21-01187

VERSUS       JUDGE TERRY A. DOUGHTY

KILOLO KIJAKAZI, ACTING       MAG. JUDGE KAYLA D. MCCLUSKY
COMMISSIONER, U.S. SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Jennifer Owens filed the instant application for Title II disability insurance benefits and Title XVI supplemental security income payments on January 4, 2016. *See* Tr. 36, 390-402. Owens, who was 51 years old at the time of the third administrative hearing, asserted a disability onset date of November 20, 2015, because of multiple sclerosis, depression, low back pain, migraines, vitamin D deficiency, B12 deficiency, insomnia, anxiety, fibromyalgia, and hypertension. *See* Tr. 64, 529-534. The state agency denied the claims initially on September 20, 2016. (Tr. 98-134). Thereafter, Owens requested and received a February 9, 2018 hearing before an Administrative Law Judge ("ALJ"). (Tr. 34-59). In an October 2, 2018 written decision, the ALJ determined that Owens was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work

that exists in significant numbers in the national economy.  (Tr. 135-148, 181-185).  Owens

petitioned the Appeals Council to review the unfavorable decision.  On September 5, 2019, the

Appeals Council granted the request for review, vacated the ALJ decision, and remanded the

case for further proceedings, with instructions, *inter alia*, to give further consideration to Owens'

RFC and to provide appropriate, supporting rationale.  (Tr. 153-155).

 Pursuant to the remand order, a different ALJ held a second administrative hearing on

February 26, 2020.  (Tr. 61-78).  However, in a March 11, 2020 written decision, the second

ALJ determined that Owens was not disabled under the Social Security Act, finding at step five

of the sequential evaluation process that she was able to make an adjustment to work that exists

in significant numbers in the national economy.  (Tr. 156-169).  Owens petitioned the Appeals

Council to review the unfavorable decision.  On September 3, 2020, the Appeals Council again

granted the request for review, vacated the ALJ decision, and remanded the case for further

proceedings, with instructions, *inter alia*, to give consideration to the opinion of Aletha Nelson,

LPC.  (Tr. 176-180).

 Pursuant to the second remand order, the prior ALJ held a third administrative hearing on

January 20, 2021.  (Tr. 80-97).  However, in a February 9, 2021 written decision, the ALJ

determined that Owens was not disabled under the Social Security Act, finding at step five of the

sequential evaluation process that she was able to make an adjustment to work that exists in

significant numbers in the national economy.  (Tr. 7-20).  Owens appealed the adverse decision

to the Appeals Council.  On April 2, 2021, however, the Appeals Council denied Owens' request

for review; thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

 On May 4, 2021, Owens filed the instant complaint for judicial review of the

Commissioner's final decision.  Following submission of the administrative transcript and

supporting memoranda, the matter is now before the court.

## **Standard of Review**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S.___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program

throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."  42 U.S.C. § 423(d)(1)(A).  A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)    An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)    If an individual's residual functional capacity is such that he or she can

4

still perform past relevant work, then a finding of "not disabled" will be made.

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.  If the individual can make such an adjustment, then he or she will be found not disabled.  If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.  20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## <u>The ALJ's Findings</u>

### I.    Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 12).  At step two, he found that the claimant suffered severe impairments of arthritic changes in the shoulder, hips, cervical and lumbar spines; hearing loss; white matter disease of the brain; obesity; depression; attention deficit hyperactivity disorder.  (Tr. 12).  He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 13).

### II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity

5

("RFC") to perform light work,[1] "except for no exposure to hazards such as dangerous machinery; no over-the-shoulder work with the left upper extremity; no more than 1-2-3 step job tasks; and no more than occasional interaction with the general public."  (Tr. 13-18).

## III.    Steps Four and Five

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work.  (Tr. 19).  Accordingly, he proceeded to step five.  At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education.  *Id.*  She subsequently changed age categories to an individual closely approaching advanced age.  *Id.*  Transferability of skills was not material to the decision.  *Id.*

The ALJ next observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. §§ 404.1569, 416.969; Table 2, Rule 202.21, Appendix 2, Subpart P, Regulations No. 4; Tr. 19-20.  However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what

---

[1] Light work entails:

. . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

extent the additional limitations eroded the occupational base for work.  *Id.*  In response, the VE identified the representative jobs of **garment folder**, *Dictionary of Occupational Titles* ("DOT") Code # 789.687-066; **laundry classifier**, DOT # 361.687-014; and **price marker**, DOT # 209.587-034.  (Tr. 19, 93-94).[2]

### <u>Non-Exhaustive Chronology of Potentially Relevant Medical Evidence</u>

A November 4, 2014 left shoulder x-ray showed mild acromioclavicular (AC) joint hypertrophy.  (Tr. 696).

A November 29, 2014 MRI of the cervical spine showed C6-C7 central herniation.  (Tr. 703-704).  Otherwise, the MRI was normal.  *Id.*

On March 3, 2015, Owens reported to Louisiana Family Medicine Clinic that her pain medication helped her to do her daily activities.  (Tr. 835-836).

In July 2015, Owens was seen at Louisiana Family Medicine for follow up for anxiety, hypertension, insomnia, and degenerative joint disease.  (Tr. 826-827).  She stated that her symptoms were well controlled with medication.  *Id.*  Her complaints of left leg pain and low back pain also were well controlled with medication.  *Id.*  However, she wanted to be tested for ADHD.  *Id.*

In August 2015, Owens reported that all of her medications were working well and that her low back pain/myalgia was controlled with medication.  (Tr. 824-825).

In October 2015, Owens reported to Louisiana Family Medicine Clinic that a man had

---

[2] The VE responded that for the garment folder, laundry classifier, and price marker jobs there were 29,657, 42,630, and 129,365 positions available nationwide, respectively.  (Tr. 93-94). This incidence of work constitutes a significant number (and range) of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

beaten her approximately every other day for about two weeks straight. (Tr. 818-819).

A November 20, 2015 brain MRI showed mild nonspecific white matter disease with differential including demyelinating disease versus small vessel ischemic change. (Tr. 684-685).

A November 20, 2015 MRI of the lumbar spine showed degenerative changes in the lower lumber spine, facet degenerative changes and mild, broad-based disc bulge at L5-S1 causing moderate left-sided foraminal narrowing. (Tr. 686-687).

Owens saw James Belue, M.D., on March 16, 2016, with complaints of moderate low back and hip pain. (Tr. 724-726).

On July 8, 2016, Owens saw Jenny Guerre, M.D., for a consultation regarding her white matter disease, following her brain MRI. (Tr. 740-744). Owens explained that the brain MRI was performed because of her migraines. *Id.* She reported smoking for many years and was now trying to quit. *Id.* She denied limb weakness, but reported recurrent falls. *Id.* She reported chronic migraine headaches since she was 15 years old. *Id.* She had been taking Imitrex and BC with good response. *Id.* She used three Imitrex pills per week. *Id.* The headaches occurred almost every day. *Id.* Upon examination, she exhibited 5/5 motor strength in all extremities. *Id.* She had a normal stride and straight posture. *Id.* Guerre opined that Owens' white matter changes were possibly related to her history of chronic migraines, microvascular changes related to her long history of smoking, and hypertension. *Id.* Her headache descriptions were consistent with migraines, possibly due to her overuse of BC. *Id.*

An August 12, 2016 MRI of the cervical spine showed broad-based bulging annulus at C6-7, with mild to moderate canal and neural foraminal stenosis bilaterally. (Tr. 749).

An August 12, 2016 MRI of the brain showed moderate white matter disease, nonspecific in nature. (Tr. 751-752). Myelinated process could not be excluded. *Id.*

In August 2016, Owens had an office visit at the Louisiana Family Medicine Clinic where she reported that all of her medications were working well for her.  (Tr. 799).

On August 30, 2016, non-examining agency physician, Hollis Rogers, M.D., completed a physical residual functional capacity assessment on which he indicated that Owens had the exertional capacity for light work, but was limited to frequent climbing, balancing, stooping, kneeling, crouching, and crawling.  (Tr. 108-109).

At the request of the state agency, Owens underwent a September 8, 2016 consultative mental clinical interview with Aletha Nelson, LPC.  (Tr. 733-738).  Owens reported that she was unable to hear in both ears.  *Id.*  She had to have things repeated and spoken loudly for her to hear and understand.  *Id.*  She was able to twist, bend, and reach without pain.  *Id.*  She reported severe anxiety, including symptoms of choking or smothering and hyperventilation.  *Id.*  She also had panic attacks and insomnia.  *Id.*  She reported a history of depression and suicidal ideation at one time in her life.  *Id.*  Owens explained that she had possible MS.  *Id.*  She had experienced generalized anxiety over a period of ten years.  *Id.*  She was able to bathe without assistance, but had fallen twice in the bathtub.  *Id.*  She reported a good relationship with her family and friends. *Id.*  Owens reported that directions/instructions needed to be repeated several times and written directions needed to be read numerous times.  *Id.*  When presented with a task, she was able to complete it if she was not distracted.  *Id.*  She tended to forget what day of the week it was.  *Id.* Her mother's questions stressed her out.  *Id.*  She smoked two packs of cigarettes per week.  *Id.*

Nelson noted that Owens was moderately distractible; she was concerned with her headache and back pain.  *Id.*  Memory was relatively unimpaired.  *Id.*  Her ability to understand, remember, and carry out simple instructions and familiar detailed instructions was average.  *Id.* She was able to follow verbal instructions when repeated.  *Id.*  Written instructions needed to be

read multiple times.  *Id.*  Her ability to sustain effort and persist at a normal pace over the course of a full workweek was diminished because of fibromyalgia.  *Id.*  She could not tolerate or adapt to the stress and demands of an ordinary home environment.  *Id.*  High pressure demands would bring about anxiety.  *Id.*

On September 15, 2016, non-examining agency psychologist, Jesse F. Dees, Ph.D., completed a mental residual functional capacity assessment form on which he indicated that Owens was moderately limited in her ability to understand, remember, and carry out detailed instructions.  (Tr. 109-111).  She also was moderately limited in her ability to maintain attention and concentration for extended periods, plus her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace.  *Id.*  In addition, she was moderately limited in her ability to interact with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers.  *Id.*  Finally, she was moderately limited in her ability to respond appropriately to changes in the work setting.  *Id.*  Dees explained that Owens would be capable of understanding, remembering, and carrying out simple two-step instructions in order to work for two-hour blocks of time in an eight-hour workday.  *Id.*  Moreover, she would function best in a non-interpersonally intensive work environment, which would allow her to relate appropriately to coworkers and supervisors.  *Id.*  Nonetheless, moderate levels of supervision would be necessary to maintain work performance and to assist her in adapting to change.  *Id.*

Owens returned to Dr. Guerre on January 19, 2017, where she reported some improvement of her symptoms with Topamax.  (Tr. 789-794).  Guerre assessed headache disorder and advised Owens to stop overusing BC.  *Id.*  She also assessed lumbago, with sciatica, and noted white matter disease.  *Id.*

On July 17, 2017, Owens underwent a hearing examination with Terry Roberts, Au.D. (Tr. 761). Testing revealed that Owens had slight to moderate sensory hearing loss. *Id.* Roberts' impression was that she would experience difficulty understanding conversation, especially in the presence of background noise. *Id.* Roberts recommended that she contact Louisiana Rehabilitation Services to see if they could assist her in obtaining hearing aids. *Id.*

Owens went to the emergency room on August 23, 2017, with complaints of chronic back pain and right hip pain that had flared up about three days earlier. (Tr. 763-773). She reported that she smoked one-half pack of cigarettes per day. *Id.* Owens was treated with medication and discharged. *Id.* She verbalized understanding of her disposition instructions. *Id.*

A December 27, 2017 MRI of the brain showed stable mild/moderate white matter signal. (Tr. 945-946, 971-972).

On January 21, 2019, Owens saw Richard Ballard, M.D., for sharp hip pain that was worse when standing and that had started about three months earlier. (Tr. 1001-1003). She reported that she was unable to stand for any length of time and unable to carry out most of her day-to-day activities. *Id.* She described her pain as a 10 on a 10-point scale. *Id.* Upon examination, Ballard did not see any neurological deficits. *Id.* There was no sign of any true hip pain. *Id.* He diagnosed tendinitis and sacroiliac dysfunction of both hips and gave her injections. *Id.*

Owens saw Kathryn Claborn, FNP, as a new patient on February 11, 2019. (Tr. 1004-1008). She complained of back and hip pain with her pain as a 10 on a 10-point scale. *Id.* She was taking Prozac and Klonopin daily that were controlling her anxiety. *Id.* Her depression was controlled also. *Id.* She smoked half a pack of cigarettes per day. *Id.* She reported no mental illness, no depression, and no anxiety. *Id.* She had no trouble sleeping. *Id.* Claborn assessed

hyperlipidemia; bulging intervertebral disc; migraine headaches; multiple sclerosis; depression; and anxiety disorder, NOS.  *Id.*

On February 28, 2019, Owens saw Thomas Strain, M.D., in order to establish care.  (Tr. 984-987).  Owens reported that she had white matter disease.  *Id.*  She explained that she had been turned down for disability and she needed a provider to sign paperwork about her conditions.  *Id.*  Strain told her that they did not do disability determination physical examinations.  *Id.*  Rather, she should "[j]ust send over the paperwork."  *Id.*  Owens said that her prior providers never sent her to see a neurologist.  *Id.*  She reported chronic pain, migraines, and an anxiety disorder.  *Id.*  Strain diagnosed hypertension, benign; migraines; chronic pain; white matter disease; mental disorder, NOS; and a BMI of 31-32.  *Id.*

A March 7, 2019 x-ray of the pelvis showed mild degenerative changes with joint space narrowing of both hips.  (Tr. 1009).

On March 7, 2019, Owens saw Dr. Ballard for a recheck.  (Tr. 1010-1012).  Her chief complaint was bilateral hip pain for the last six months.  *Id.*  She described her pain as a 5 on a 10-point scale.  *Id.*  Ballard noted that Owens was a very pleasant lady, who denied any injury. *Id.*  Upon examination, she had pain with internal and external rotation.  *Id.*  Although x-rays showed mild degenerative change, Ballard was concerned that something more was going on – possibly some avascular necrosis.  *Id.*  Ballard diagnosed impingement and degenerative arthritis of the hip.  *Id.*

Ballard's suspicions were confirmed on March 15, 2019, when an MRI of the pelvis showed a nondisplaced fracture of the right bony ilium.  (Tr. 1013).

Owens returned to Dr. Strain on March 21, 2019, for her three-week follow-up for pain. (Tr. 988-991).  Owens was given the numbers to call Louisiana Pain and LSU-Neurology to see

12

when she could schedule an appointment.  *Id.*

On April 4, 2019, Owens saw John Fairbanks, M.D., for complaints of cervical spine pain and right sciatica.  (Tr. 1208-1215).  Owens' "husband" was angry with her prescribed medications.  *Id.*  He wanted her to have stronger medication.  *Id.*  It was explained to Owens and her husband that x-rays did not support Norco or stronger opioids, and that they would have to await the MRI results.  *Id.*  Owens' husband said that he wanted to speak to the doctor because his wife was in pain all the time.  *Id.*  Owens was advised to avoid cigarette smoke and learned about the importance of staying active.  *Id.*

An August 1, 2019 x-ray of the lumbar spine showed degenerative changes without acute radiographic abnormality.  (Tr. 973).

An August 1, 2019 MRI of the lumbar spine showed mild to moderate lumbar spondylosis, which was secondary to facet arthrodesis that was severe inferiorly.  (Tr. 976-977).

Owens returned to Dr. Strain on August 21, 2019, to obtain her MRI results.  (Tr. 992-993).  She was not feeling down or depressed at all, but reported pain in her hips.  *Id.*  Strain wanted her to see a physical therapist.  *Id.*  He assessed spinal muscle atrophy, neuralgia, white matter disease, and chronic pain syndrome.  *Id.*

On September 16, 2019, Owens saw Douglas Brown, M.D., for her low back and bilateral leg pain that she had experienced for the past three to five years, but had worsened over the past three months.  (Tr. 964-965).  She reported that her pain was constant, worse with standing, walking, bending, and lifting.  *Id.*  However, it was relieved by sitting and by driving.  *Id.*  She also had a burning sensation in her right leg or foot.  *Id.*  Straight leg raise and Waddell's tests were negative.  *Id.*  Muscle bulk, tone, and sensation were normal.  *Id.*  No lumbosacral spine weakness was observed.  *Id.*  She also had no hip, knee, or ankle weakness.  *Id.*  Her gait

and stance were normal.  *Id.*  Brown referred her for pain management.  *Id.*

Owens returned to Dr. Strain on October 2, 2019, for medication refill and complaints of hip, leg, and back pain.  (Tr. 1024-1027).  She was doing well overall.  *Id.*  She had been homeless for a while, but now was living with a friend.  *Id.*  She felt less stress.  *Id.*

On January 6, 2020, Owens saw Oner Khera, M.D., for her back pain and bilateral lower extremity radiculopathy.  (Tr. 1085-1090).  Owens stated that her pain was quite debilitating.  *Id.*  She has not received any physical therapy or injections.  *Id.*  However, she appeared well, in no acute distress, alert, and oriented.  *Id.*  Her strength and sensation were fully intact for her lower extremities.  *Id.*  She walked with a steady gait.  *Id.*  Straight leg raise maneuver was negative bilaterally.  *Id.*  She had decreased lumbar range of function with extension and forward flexion secondary to pain.  *Id.*  She also had a full range of motion of her cervical spine and bilateral elbows and knees.  *Id.*  Dr. Khera assessed low back pain, bilateral lower extremity radiculopathy, L5-S1 grade 1 anterolisthesis with facet gapping and facet arthropathy; lateral recess stenosis bilaterally L5-S1, moderate to severe; and right-sided foraminal stenosis, moderate, L5-S1.  *Id.*  She was not a strong surgical candidate at that time.  *Id.*  He recommended conservative measures to include physical therapy and/or possible injections.  *Id.*  Owens explained, however, that transportation presented an obstacle for the physical therapy appointments.  *Id.*  Khera said that he would see her back on an as-needed basis.  *Id.*  He also encouraged her to stop smoking.  *Id.*

On January 8, 2020, Owens saw Monte Moore, APRN, for her anxiety and depression. (Tr. 1074-1077).  Depression screening indicated moderately severe depression.  *Id.*  She was twice divorced from volatile, physically and emotionally bilaterally abusive marriages.  *Id.*  She was unilaterally aggressive and abusive to her current boyfriend.  *Id.*  She admitted to weekly

migraines.  *Id.*  She denied brain damage.  *Id.*  She admitted to dizziness and moderate memory loss.  *Id.*  Moore diagnosed her with chronic PTSD, major depressive disorder, anxiety, and sleep disturbance.  *Id.*

On February 3, 2020, Owens saw neurosurgeon, Donald Ray Smith, M.D., for her complaints of lumbar back pain with bilateral lower extremity pain.  (Tr. 1065-1067).  Her symptoms had started about three years earlier without any specific trauma, but had gradually increased over time, especially over the past six months.  *Id.*  She took ibuprofen, but most of the time, she just "suffer[ed]."  *Id.*  She described the pain as aching, burning, and moderate in intensity.  *Id.*  The pain radiated to the right foot, right knee, and right thigh.  *Id.*  However, she was negative for arthralgias, myalgias, neck pain, and stiffness.  *Id.*  She reported that she walked at home, but had not received any physical therapy.  *Id.* Upon examination, she had 5/5 motor strength throughout.  *Id.*  Straight leg raise was good.  *Id.*  Hip mobility was poor; rotating the hips caused pain.  *Id.*  Smith assessed Owens with degenerative disc disease, lumbar; low back pain radiating to both legs; plus numbness and tingling.  *Id.*

On February 10, 2020, Owens returned to Dr. Strain for follow-up.  (Tr. 1072-1073).  He assessed her with chronic pain syndrome, essential hypertension, GERD, and dysuria.  *Id.*

Owens returned to Monte Moore, APRN, on July 13, 2020, for medication management.  (Tr. 1106-1110).  She had moderate anxiety and depression.  *Id.*  Moore diagnosed, *inter alia*, ADHD, sleep disturbance, anxiety, and major depressive disorder.  *Id.*

Owens next saw Monte Moore, APRN, on August 18, 2020, for medication follow-up.  (Tr. 1102-1105).  She had moderate anxiety and depression.  *Id.*  Moore assessed ADHD, predominately inattentive.  *Id.*

Owens returned to Dr. Strain on September 24, 2020, to discuss neurology results and to

15

request a shower chair and a cane.  (Tr. 1099-1101).   Strain referred her for a four-prong cane and shower chair as a result of her multiple sclerosis, her white matter disease, and her chronic pain syndrome.  *Id.*

A September 24, 2020, MRI of the cervical spine showed mild degenerative changes more prominent at C6-C7 with a broad-based disc protrusion abutting the thecal sac and causing mild right-sided foraminal stenosis.  (Tr. 1240-1242).

Owens returned to Monte Moore, APRN, on October 7, 2020, for medication follow-up. (Tr. 1094-1098).  She had mild anxiety and moderate depression.  *Id.*  Her attention/concentration was distracted.  *Id.*  Her immediate memory was impaired.  *Id.*  Her fiancée had passed away, and she was in chronic bereavement.  *Id.*  Moore diagnosed ADHD, predominantly inattentive type, and nicotine dependence.  *Id.*

Owens saw Julie Evans, LPC, on November 5, 2020, for new patient intake. (Tr. 1160-1163).

Owens returned to Monte Moore, APRN, on December 2, 2020.  (Tr. 1155-1159).  At that time, she had severe anxiety and moderate depression.  *Id.*

On December 9, 2020, Owens saw Jimmy Young, M.D. for follow-up for white matter disease and migraine headaches.  (Tr. 1222-1226).  She reported excessive fatigue and recent forgetfulness.  *Id.*  She had suffered multiple falls recently.  *Id.*  Her MRIs indicated that her white matter spots were microvascular diseases versus migraine and did not resemble demyelinating pattern/etiology.  *Id.*  Owens reported that she had migraine headaches three to four times per month that lasted between 3 to 72 hours, but ten hours on average.  *Id.*  They were alleviated by lying quietly in a dark place.  *Id.*  She was able to stand and ambulate normally.  *Id.* Young ruled out MS.  *Id.*  Owens' neurological examination was unremarkable with fair

16

memory.  *Id.*  Her MRI was unremarkable, except for mild degenerative changes.  *Id.*  She

reported modest control of her migraines and would not consider switching medication.  *Id.*  She

was to return to the clinic in ten months.  *Id.*

On December 10, 2020, Owens saw Julie Evans, LPC, for anxiety and depression.  (Tr.

1151-1154).  Owens admitted that she still was in shock over the loss of her boyfriend.  *Id.*  She

had elevated anxiety and depression.  *Id.*  She took care of her mother who was in a wheelchair.

*Id.*  She admitted that she slept too much.  *Id.*  Her memory was intact, and she was oriented x4.

*Id.*  She had full immediate recall, and her attention was within normal limits.  *Id.*  Judgment and

insight were fair.  *Id.*  She had moderate anxiety and depression.  *Id.*  Owens denied aggressive

behavior or anger problems.  *Id.*  Evans assessed major depressive disorder, chronic post-

traumatic stress disorder, ADHD, and anxiety.  *Id.*

## Analysis

Owens sets forth three assignments of error:

1.    **The Commissioner erred because Ms. Owens' limitations from hearing loss were not provided in vocationally specific terms;**

2.    **The Commissioner erred because the ALJ did not correctly weigh opinions from acceptable medical sources and from nonmedical sources and explain the reasons for the weight given to such opinion evidence, and those reasons that were given are non-existent; and**

3.    **The Commissioner erred because limiting Ms. Owens to no exposure to hazards such as dangerous machinery does not satisfactorily accommodate her severe mental impairments and fails to provide her restrictions in vocationally specific terms.**

The court will address the hearing loss issue separately, but otherwise combine the

remaining two arguments because they pertain to Owens' mental residual functional capacity.

I.        **Hearing Loss Limitation**

In his decision, the ALJ stated,

> [t]he audiologist reported that the claimant has slight to moderate sensory hearing loss. She would have difficulty understanding conversation in the presence of background noise. The RFC limitation to jobs not requiring more than occasional interaction, or around dangerous machinery, address this problem, in addition to the residual effects from her mental condition.

(Tr. 15) (internal citation omitted).  In other words, the ALJ appeared to credit the audiologist's finding that Owens had slight to moderate hearing loss, especially in the presence of background noise.  He then endeavored to accommodate Owens' hearing loss by limiting her to occasional interaction with the general public and to no exposure to hazards such as dangerous machinery.

As Owens emphasized in her brief, however, the foregoing limitations do not go far enough because they do not contemplate background noise from sources other than dangerous machinery or interaction with supervisors and co-workers.  At the hearing, the VE testified that the noise level at the representative jobs he identified was no more than moderate.  (Tr. 94-95).  However, the ALJ did not pose an alternative hypothetical to the VE that included only occasional contact with co-workers and supervisors, and thus, the ALJ failed to fully account for the effects of her hearing loss that he recognized as a severe impairment.  (Tr. 12).  In short, the error potentially affected Owens' substantial rights and was not harmless. *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir.1988) (procedural perfection is not required so long as any error does not affect a party's substantial rights).

II.       **Mental Residual Functional Capacity Assessment**

Owens contends that the ALJ assessment of the effects of her mental impairments ("mental RFC") is not supported by substantial evidence because he erred in his consideration of

18

the opinion evidence and because he failed to accommodate the effects of her severe mental impairments in vocationally specific terms.  The court agrees.

"[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000) (citations omitted).

Here, the ALJ acknowledged that consultative licensed professional counselor, Aletha Nelson, had found that Owens' ability to sustain effort and persist at a normal pace over the course of a full workweek was diminished because of fibromyalgia.  (Tr. 18, 733-738)*. Furthermore, she could not tolerate or adapt to the stress and demands of an ordinary home environment, and that high pressure demands would bring about anxiety.  *Id.*  The ALJ resolved Ms. Nelson's findings as follows,

> [m]y review of the counselor's report clearly indicates that her conclusions were drawn solely from the claimant's subjective complaints and history. The counselor did not review any medical evidence of record or conduct diagnostic testing of any kind. Her remarks regarding the claimant's inability to sustain a 40-hour workweek are unsupported in the main, as I see no diagnosis or treatment for fibromyalgia over the past 5 years. The remaining areas of function addressed by the counselor appear unsupported as well by detailed clinical findings or reference to other medical evidence of record. I further note that the counselor's conclusions conflict wildly with those of the DDS psychological consultants set forth above, who conducted extensive reviews of all evidence of record and who possess the credentials of doctors of psychology. In my view these factors rendered their opinions more authoritative. For these reasons I cannot give evidentiary weight to the counselor's medical source statement.

(Tr. 18).

At the outset, the court agrees that there no evidence that Owens has an ongoing issue with fibromyalgia, and, thus, his rationale for discounting that portion of Nelson's findings that

was tied to the phantom fibromyalgia diagnosis is well-supported.  Nevertheless, the ALJ then purported to discount the remaining areas of functioning addressed by Nelson on the basis that they were not supported by detailed clinical findings or by reference to other medical evidence of record.  However, Nelson indicated that Owens would need to avoid high pressure situations, which was evidenced by Owens' difficulty with tolerating the stress and demands even in an ordinary home environment.

The ALJ also seemed to fault Nelson for her failure to review any medical evidence or to conduct any diagnostic testing.  However, Nelson *did* review the records that the state agency provided her, i.e., Owens' function report and records from James Belue, M.D.  *See* Tr. 734. Furthermore, it is not clear what additional testing the ALJ wanted the licensed professional counselor to perform.  The Commissioner, via the state agency, selected the consultative examiner who, by regulation, is required to be a qualified medical source able to perform the type of examination or testing requested.  *See* 20 C.F.R. §§ 404.1519a and 404.1519g (2016).

In addition, the ALJ further discounted Ms. Nelson's findings because they "conflicted wildly" with the findings of the "DDS psychological consultants."  However, the record contains findings from only one DDS psychological consultant, Jesse Dees, Ph.D., in this "disability redesign prototype" case.[3]  Moreover, for claims filed prior to March 27, 2017, "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*."  *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir. 1991) (quoting *Villa v. Sullivan,* 895

---

[3] Dees' findings appear twice in the record because the stage agency issued initial determinations for both of the concurrent Title XVI and Title II applications.   *See* Tr. 111, 129.

F.2d 1019,1024 (5ᵗʰ Cir. 1990)) (emphasis added).[4]  Therefore, the ALJ was not permitted to rely on the opinion of the non-examining psychologist where it "conflicted wildly" with that of the examining psychologist/counselor.

The ALJ also stated that he found Dees' opinion "partly persuasive" and that he assigned it "some evidentiary weight." (Tr. 17).  However, he added, without explanation, that "later evidence as discussed above" led him "to provide further modification to her non-exertional RFC limitations."  *Id*.  Ultimately, the ALJ seemed to conclude that Dr. Dees' opinion supported his RFC because he stated that, "the above medical source statement[ is] persuasive enough to bolster" the RFC determination.  *Id*.

However, Dr. Dees' opinion is not coextensive with the ALJ's mental RFC.  Dees indicated that Owens would function best in a non-interpersonally intensive work environment, which would allow her to relate appropriately to coworkers and supervisors.[5]  Indeed, in his application of the psychiatric review technique, the ALJ also recognized that Owens had a moderate limitation in the domain of interacting with others.  (Tr. 16).  Of course, "[t]he public, supervisors, and co-workers are distinct groups, and are separately addressed on the mental RFC forms.  Thus, limitations on one type of interaction in the RFC does not account for limitations

---

[4]  Also, a non-examining physician/psychologist's opinion does not provide good cause for an ALJ to discount the findings of an examining physician.  *See Lamb v. Bowen*, 847 F.2d 698, 703 (11ᵗʰ Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician."  *Villa, supra* (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5ᵗʰ Cir. 1980)).

[5]  Dees also stated that Owens would need a moderate level of supervision to help her maintain work performance and to assist in adapting to change.

on the others." *Peggy C. v. Kijakazi*, Civ. Action No. 19-17472, 2021 WL 3206812, at *6 (D.N.J. July 29, 2021) (citations omitted). Consequently, where an ALJ finds that the claimant is "moderately limited in interacting with others," his unexplained decision to omit a limitation relating to interaction with supervisors (and co-workers) cannot be excused as harmless error. *Peggy C., supra*.[6]

Finally, the court would be remiss if it failed to point out that LPC Nelson and Dr. Dees issued their opinions in 2016 based on Owens' recognized impairments at that time. The current ALJ decision, however, was issued more than four years after these opinions and Owens has since received additional diagnoses for ADHD and PTSD. There is no indication that Nelson and Dees considered the effects of these additional mental impairments. Moreover, the ALJ conceded that "[t]he nature of depression, anxiety, and ADHD suggests that the claimant could not be expected to engage in full-time work activity without some accommodations for her impairments and symptoms." (Tr. 17). He further noted that Owens' symptoms waxed and waned at her monthly mental health appointments. *Id*. However, he made no further accommodation for the effects of her mental impairments.

In sum, the court is constrained to find that the ALJ's residual functional capacity assessment is not supported by substantial evidence. *See, e.g.*, *Simmons v. Colvin*, Civ. Action No. 15-1673, 2016 WL 4384366, at *9 (W.D. La. May 31, 2016), *R&R adopted,* 2016 WL 4384783 (W.D. La. Aug. 16, 2016) (ALJ's RFC not supported by substantial evidence where the non-examining psychologists indicated, *inter alia*, that the claimant's interaction with co-

---

[6] The ALJ also found that Owens had a moderate limitation in the domain of concentration, persistence, or pace. (Tr. 16). However, there is no indication that a limitation to 1-2-3 step job tasks would account for limitations in that domain.

workers and supervisors was limited to non-confrontational situations, with respectful supervision and constructive criticism, but the RFC failed to include any limitations relating to supervisors).

## III.    Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that Owens is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  42 U.S.C. § 405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.  Owens' residual functional capacity assessment remains indeterminate.  Upon remand, the parties may consider contacting Owens' treating physicians and mental health professionals and ask them to complete medical source statements. The Commissioner also may send Owens for a new consultative examination(s) and have that physician/psychologist complete a medical source statement.

## <u>Conclusion</u>

For the foregoing reasons,

23

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY's FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 31st day of August, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

24